Filed 2/5/21  In re M.O. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.O., a Person Coming Under the Juvenile Court Law. | H048304<br>(Santa Cruz County<br>Super. Ct. No. 18JU00015) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>B.L.,<br><br>        Defendant and Appellant. | |

On October 20, 2017, the Santa Clara County Department of Family and Children's Services (Santa Clara Department) filed a petition under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1)[1] relative to a boy, M.O. (the minor), who was then four years old.  According to an attachment to the initial hearing report, the minor was diagnosed with cerebral palsy at the age of one.  B.L. is the minor's mother.  The minor was placed into protective custody after having sustained a suspicious

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

leg fracture about which mother had given an explanation that was inconsistent with the type of injury sustained. The juvenile court of Santa Clara County declared the minor a dependent child, and he was initially placed in out-of-home foster care. The minor was returned to mother's care in November 2017, and in January 2018, the juvenile court ordered that mother receive family maintenance services. At that time, the juvenile court transferred the proceeding to Santa Cruz County Superior Court.

In June 2018, the Santa Cruz County Human Services Department (Santa Cruz Department or Department) filed a petition seeking the second removal of the minor, based upon mother's minimal participation in her case plan, the existence of several child welfare referrals, and the Department's conclusion that mother was unable to meet the minor's medical, educational, and physical needs, particularly in light of his cerebral palsy. The juvenile court of Santa Cruz County ordered the minor's removal from mother's care in June 2018. Mother received family reunification services. In October 2019, the juvenile court terminated mother's services and scheduled a selection and implementation hearing pursuant to section 366.26 (366.26 hearing).

The contested 366.26 hearing took place on July 20, 2020, when the minor was seven and one-half years old. At that time, mother asserted the applicability of a statutory exception to adoption and the termination of parental rights, namely, the beneficial parental relationship (see § 366.26, subd. (c)(1)(B)(i)). After the presentation of evidence, including testimony and exhibits provided by mother, the juvenile court found that the minor was generally and specifically adoptable, rejected mother's beneficial parental relationship claim, ordered that adoption was the permanent plan for the minor, and terminated mother's parental rights.

Mother filed an appeal from the order after the 366.26 hearing. She argues that the juvenile court abused its discretion in denying her claim of the beneficial parental relationship exception to adoption. Finding no error, we will affirm the juvenile court's order.

# I. FACTS AND PROCEDURAL HISTORY[2]

## A. The Minor's Detention (October 2017)

On October 20, 2017, the Santa Clara Department filed a petition under section 300, subdivisions (a) and (b)(1) relative to the minor, who was then four years old. The minor's father, J.O., was incarcerated. It was alleged that on October 19, the minor had "suffered a spiral-like fracture of his right tibia" that the treating physician found would have resulted from "an 'aggressive twisting motion.' " Mother had advised that the minor had been injured when a store employee bumped into him, causing the minor to fall. The physician opined that the explanation was "inconsistent with the mechanism required to produce the injury . . . and the injury [was] therefore suspicious for child abuse." The reporting party to the referral also advised that the minor had been previously diagnosed with cerebral palsy and autism. At the time of the referral, mother and the minor were homeless. The minor was placed in protective custody on October 19.

The Santa Clara Department alleged further that mother had an extensive (20-plus year) history of substance abuse, and she had continued to use drugs after completing multiple treatment programs, including an in-patient program.[3] Mother also was arrested in July 2013 after driving recklessly and under the influence of drugs while the minor (then six months old) was a passenger.

---

[2] There was a related proceeding in this court in which mother filed a notice indicating she intended to file a writ petition challenging the juvenile court's order of October 23, 2019, terminating reunification services and setting a 366.26 hearing. A record was completed and filed, but mother did not file a writ petition; the appellate proceeding was complete on December 9, 2019. (See *B.L. v. Superior Court*, H047486.) On our own motion, we take judicial of the record filed in that writ proceeding, and we will refer to that record in this opinion. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[3] In a later report, the Santa Cruz Department advised that mother "had attended about seven different drug treatment programs as of 2011."

Mother had a prior child welfare history involving the minor, and, earlier, the minor's half-sister. In October 2011, A.A., the minor's half-sister, was declared a dependent child due to her having been "born with a positive toxicology for methamphetamine." Mother received family reunification services but failed to regularly participate and make substantive progress; services were terminated, and in September 2012, mother's parental rights were terminated. As to the prior proceeding involving the minor, he was declared a dependent child in September 2013 due to caretaker abandonment after mother's arrest for driving under the influence and driving recklessly with the minor in the vehicle. Mother received reunification services, the minor was later returned to mother's care with family maintenance services, and the case was dismissed in January 2015 with mother being awarded full legal and physical custody.

The Santa Clara Department alleged further that father was incarcerated and had an extensive criminal history. Mother also had a history of convictions for drug-related offenses.

On October 23, 2017, the juvenile court ordered the minor detained with temporary placement vested with the Santa Clara Department. The court also indicated in its order that, having made inquiry, the Indian Child Welfare Act (the ICWA) did not apply and no notice under the ICWA was required.

**B.      Jurisdiction/Disposition Hearing (January 2018)**

In November 2017, pending the jurisdiction hearing, the minor was released to mother under the condition that she cooperate with the Home Supervision Program.

In an amended petition filed November 13, 2017, the Santa Clara Department alleged, inter alia, that mother had failed to meet the special medical needs of the minor (left hemiparesis and cerebral palsy). It alleged that mother had missed several medical appointments for the minor since April 2016 and the minor had "not attended

4

occupational and physical therapy sessions since November 2016[,] which place[d] the child at risk for neglect in her care."

In its jurisdiction report, the Santa Clara Department advised that based upon its investigation, including a report from a physician from the Center for Child Protection (Center) that the minor's injury that resulted in the detention may have been accidental, because he had an unstable gait and may have fallen with sufficient force to sustain a spiral fracture. The Santa Clara Department noted that the Center had advised in November 2017 that the minor "would benefit from physical, occupational, and speech therapy. In addition, [the minor's] need for physical therapy is magnified by his [c]erebral [p]alsy because medical records indicated that he ha[d] a significant limp and much less strength on his left side. . . . [¶] . . . Physical [t]herapy can help improve motor skills and prevent motor problems from getting worse over time. . . . The [Center physician] reported that [the minor] will need consistent physical therapy for years to come as early intervention is critical to achieve optimal physical functioning." The Santa Clara Department expressed concern that mother had not facilitated the minor's receiving physical and occupational therapy over the prior year, which "was likely a contributing factor to his fall."

In or about December 2017, mother secured housing at the Rebele Family Shelter in Santa Cruz. The term of this housing arrangement was three to six months.

At the uncontested jurisdiction hearing on January 8, 2018, the juvenile court found the allegations of the petition, as amended true, and that the minor was a person described under subdivision (b)(1) of section 300. It was further ordered that mother would retain custody of the minor subject to supervision by the Santa Clara Department with family maintenance services. The juvenile court ordered the proceeding transferred to Santa Cruz County Superior Court.

5

### C. Supplemental Petition (June-August 2018)

The Santa Cruz Department filed a supplemental petition pursuant to section 387 on June 27, 2018 (section 387 petition), seeking an order detaining the minor. It alleged that mother was unable to meet the medical, educational, and physical needs of the minor, who has cerebral palsy and an ongoing need for physical and occupational therapy. These circumstances placed him at substantial risk of abuse or neglect. The Department alleged that, since January 2018, the minor had missed 10 of 14 medical appointments, six out of seven physical therapy appointments, and nine of 16 occupational therapy appointments. Mother had failed to enroll the minor in kindergarten, and she had not taken him to a necessary dental appointment.

The Department alleged further that mother had "been minimally engaged in her court-appointed case plan[,] . . . ha[d] not followed through with a substance use assessment and ha[d] not consistently drug tested." Mother was inconsistent in taking the minor to counseling sessions, having taken the minor to his first two sessions and then having no-showed to six follow-up appointments. Because of the minor's cerebral palsy, braces for his feet had been prescribed; mother had not followed up in obtaining the braces for her son. She had also not made progress to obtain stable housing for herself and the minor; she was evicted from the shelter effective June 22 with a two-week extension thereafter granted. The Department also stated that on June 4, mother had failed to pick the minor up from school at 2:15 p.m. and could not be reached; she did not arrive at school until 6:30 p.m.

In its report in support of the supplemental petition, the Department advised that there had been three recent referrals related to the minor's safety. On March 27, 2018, there was a report that mother had " 'been displaying some unusual behaviors such a hid[ing] inside of another tenant[']s closet on [the night of] March 23rd with her child.' " The same reporter also stated that mother had left the minor unattended on occasion for

up to an hour. Evening staff also noted that mother at times wore sunglasses at night and was " 'scattered and moody.' "

In the second referral, on May 4, 2018, it was reported that the minor was picked up at 3:00 p.m. by his Court Appointed Special Advocate (CASA) worker, who was scheduled to return him to mother's care at 5:00 p.m. Mother was not at the family shelter at that time, and the CASA worker was unable to reach her. Mother later answered the phone at approximately 6:50 p.m. and was slurring her words. Mother appeared shortly thereafter; the coordinator of the shelter said that when mother arrived, she was not slurring her words and did not appear to be under the influence.

And on June 4, 2018, mother failed to pick up the minor from school at the end of session at 2:15 p.m. and she was not reachable. Law enforcement was ultimately contacted but mother picked up the minor by 6:30 p.m.

There was a fourth incident mentioned by the Department in its report that did not result in a referral. On June 2, 2018, at 10:30 p.m., officers responded to a report of suspicious activity involving the occupants of two vehicles parked next to each other on Pioneer Street next to railroad tracks in Santa Cruz. According to the police officer's report, there were "people coming and going from the vehicles." Mother was the driver of one vehicle and her son was in the back seat. A trained K9 dog sniffed the outside of both vehicles and " 'hit on both vehicles.' " The driver of the other vehicle was arrested for possession of 3.8 grams of methamphetamine and a short-barreled rifle. Mother was released at the scene.

The Department concluded that "while [mother was] a strong advocate for [the minor], she has not followed through in meeting all of [his] special needs . . . . [¶] The risk of further abuse or neglect to [the minor] while in his mother's care is high. It appears that [mother] may have untreated substance use that affects her ability to provide protection, supervision and care for [the minor]. [Mother] has made little progress towards changing her behavior . . . . [She] does not seek and/or follow through with

7

treatment for [the minor's] immediate and chronic medical conditions, and[] she does not follow prescribed treatment[,] resulting in significant danger to [the minor]."

After a contested detention hearing on June 29, 2018, the juvenile court ordered that the minor be temporarily detained in the care of the Department, finding that there was a substantial risk to the minor's physical and mental health. The court ordered that mother would receive supervised visitation of the minor at a minimum of two times per week.

In connection with the pending section 387 petition, the minor's CASA representative, Rebecca Meredith, filed a report. She advised that she had attended the minor's school in April, where he was receiving speech, occupational, and physical therapy. His teacher reported that the minor often arrived late and missed breakfast. Mother consistently arrived late to pick up the minor from school, resulting in mother receiving warning letters. Meredith advised that on June 14, she received a call from the school requesting that she pick the minor up from school; she could not do so because she was out of town. The Sheriff was called by the school; mother ultimately arrived approximately three hours late to pick up the minor. The teacher reported that the minor sometimes became frustrated and angry, and at one time threw a chair. The teacher advised that the minor was not toilet-trained; mother reported that this was not due to a medical reason.

Meredith also advised that when she picked up the minor for visits and then returned him to the family shelter, mother was consistently late (by approximately 30 minutes), resulting in Meredith having to wait until mother arrived. On one occasion on May 4, mother was two hours late, prompting notification to CPS. The family shelter also reported that between 10:00 p.m. and 3:00 a.m. on May 29-30, the minor had come to a staff member's room crying and said that mother was gone. Mother arrived approximately one hour later.

Meredith contacted the minor's behavioral health specialist, who advised that the minor had attended his first two appointments in January 2018. He missed four appointments thereafter and mother had canceled three appointments. The therapist advised that the minor needed to be seen at least twice a month. In the first six months of 2018, the minor had attended only three appointments.

Meredith concluded that the minor's needs were not being met by mother. Medical appointments for the minor were consistently missed, and his educational needs required consistent school attendance and parental support. Meredith advised that she had "serious concerns for [the minor's] safety and health."

The Department filed an adjudication report on July 24, 2018, in anticipation of the jurisdiction/disposition hearing on its section 387 petition. In addition to its recommendation that the minor be in out-of-home custody, the Department recommended that mother not receive reunification services pursuant to section 361.5, subdivision (b)(10), (11), and (13).[4]

---

[4] Reunification services may be ordered bypassed by the juvenile court, upon a showing by clear and convincing evidence, under, inter alia, the following circumstances: "(10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian. [¶] (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent. [¶] . . . [¶] (13) That the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even

9

In a supplemental prehearing report filed August 22, 2018, the Department advised that mother had arrived one-half hour late for the minor's physical therapy appointment on July 5. On the afternoon of July 25, mother sent a text indicating she would not be able to attend the minor's initial SARC assessment because of "a 'long-standing' intake appointment at Family Preservation Court; without explanation, mother did not attend either appointment that day. On July 26, mother did not attend the minor's scheduled dental appointment despite a reminder being sent to her by the resource parent. And mother missed the minor's occupational therapy and therapist appointments on July 27 and August 2, respectively. The Department reported that mother was 15 minutes late for her supervised visit with the minor on July 16, missed her visits on July 23 and July 27, and had her July 30 visit canceled because she failed to call to confirm it.

The Department also reported that the resource parents had an ongoing arrangement allowing for mother to telephone the minor between 6:45 p.m. and 7:15 p.m. nightly; the schedule was intended to be inflexible to afford the minor consistency and a regular sleep schedule. Between late June and early August, mother often called outside of the time schedule and the resource parents did not take the calls, or mother failed to call at all. The resource parents advised that the phone calls that occurred were fairly brief, and the minor generally was distracted and not interested in pursuing the conversations.

At the jurisdiction/disposition hearing on the Department's section 387 petition on August 28, 2018, the juvenile court found the allegations of the supplemental petition true and sustained the supplemental petition. The court ordered that the minor continue as a dependent child in the custody of the Department. The Department having advised the court that it was withdrawing its recommendation that services be bypassed, the

though the programs identified were available and accessible." (§ 361.5, subd. (b)(10), (11) & (13).)

juvenile court granted family reunification services to mother, and it ordered that she receive supervised visitation of a minimum of two times per week. The court also ordered that mother submit to a psychological evaluation.

### D.     Six-Month Review (February 2019)

In a February 2019 report, the Department advised the court that mother had "struggled to remain consistently engaged with service providers" throughout the period of reporting. Drug testing[5] and the court-ordered psychological evaluation were not pursued by mother until the end of the reporting period, and she had not yet started individual counseling. Between August and November 2018, mother had missed 11 of the 19 appointments that had been scheduled on the minor's behalf.

The minor was residing in a foster home in Monterey County. It was reported that he had started kindergarten at a new school that he liked very much. He had made some new friends, had been practicing swimming, and had "learned new skills related to physical activities such as hiking, climbing on playground equipment and using his left hand more frequently in various activities of daily living." The minor's resource parents advised that the minor had made progress in toilet training and had progressed from needing assistance at school in toileting to being independent.

The Department advised that the quality of mother's supervised visits with the minor was adequate. It was reported that from August through December 2018, mother arrived on time 15 times, arrived late 10 times, and no-showed on 12 occasions. On one visit (November 19), staff expressed concern that mother was under the influence.

The Department concluded that at the time of its report, "the risk of future neglect or abuse to [the minor] while in his mother's care is very high," there "has been minimal

---

**5** The Department reported that mother was a no-show for 16 scheduled drug tests between July and November 2018.

engagement on [mother's] part for much of [the] reporting period," and "little progress has been made toward changing [mother's] behavior."

The Department submitted a report of a psychological evaluation of mother that had been previously ordered in August 2018 by the juvenile court. The evaluator, neuropsychologist Gerard Chambers, Jr., Psy.D., Ph.D., met with mother for 10 hours over two days in December 2018. Mother had a past diagnosis of anxiety/depression treated through medication that she was not taking regularly. Dr. Chambers noted that mother "present[ed] with a pervasive pattern of complex trauma originating in early childhood . . . [and] depression and anxiety that remains uncontrolled at this time." He stated that there was "a history of significant alcohol and stimulant abuse with some ambiguity about her true length of sobriety." Dr. Chambers diagnosed mother with "Other Specified Trauma and Stressor Related Disorder, Severe," "Stimulant Use Disorder, In Possible Remission, Severe," and "Alcohol Use Disorder, In Possible Remission, Severe," He explained that mother's substance abuse conditions were possibly "in full remission, and her uncontrolled mental health issues [were] creating a pattern that appear[ed] to be substance-related. It [was] also equally plausible that [mother was] abusing substances and concealing it from the court [as] evidenced by her erratic testing and the latency between when required and actual UA-testing transpire[d]." Dr. Chambers suggested a two-pronged approach: mother would first achieve mental health stability and demonstrate adaptive functioning (e.g., stable employment, transportation, hygiene and housing); and second, mother would demonstrate the ability to care for the special needs of her son incrementally and with supervision. He recommended that mother see a psychiatrist for medication management, and that she visit a psychotherapist for weekly treatment.

At the six-month review hearing on February 21, 2019, the juvenile court ordered that the minor remain a dependent child and that mother's reunification services continue.

12

**E.    Interim Hearing (May 2019)**

The juvenile court conducted an interim status hearing May 23, 2019.[6]  The Department reported since the last hearing in February, mother had received 32 drug testing opportunities, had tested negative 24 times, had tested positive for methamphetamine once, and had no-showed seven times.  Mother had 67 opportunities for telephone contact with the minor and had called 34 times.  And of the minor's 18 medical appointments, mother had arrived late on five occasions and had no-showed for 12 of the appointments.

Prior to the interim hearing, CASA worker Meredith submitted a report indicating that mother had not appeared for the minor's two-hour appointment on March 8, 2019, with pediatric psychologist, who was conducting testing for Attention Deficit and Hyperactivity Disorder (ADHD).  Mother was also a no-show for the minor's appointment with his pediatrician on March 14, a visit which had been prompted by the psychologist's findings and recommendation that the minor begin taking medication to treat ADHD.

**F.    Twelve-Month Review Hearing (October 2019)**

*1.    Hearing Reports*

**a.    Department Reports**

In its report filed August 2, 2019, the Department advised that during the reporting period, mother had missed four supervised visits and had missed 19 opportunities to speak on the telephone with the minor (either due to failure to call until too late in the evening or failing to call at all).  Mother also continued to "struggle[] with arriving at [the minor's] medical and therapy appointments on time."  She missed 14 medical and

---

[6] The Department noted in a later report that on May 23, the "case was called several times, and [mother] arrived almost two hours late. . . .  [S]he could not provide a reason for her delay."

13

specialty appointments for the minor, including missing separate appointments with the minor's new pediatrician and a gastroenterologist. She also arrived late to four medical, behavioral health, and occupational therapy appointments. The Department reported that these missed visits, calls, and appointments had a negative impact on the minor, as shown through his "expressing feelings of sadness, anger and frustration."

The Department reported that the quality of mother's supervised visitation was "adequate." The minor had frequent toileting accidents during or after the supervised visits; he did not have such accidents at other times. Staff at the Parents Center attempted to work with mother on a toileting routine for the minor, but she was not receptive to its implementation. It was also reported by visit supervisors that mother ignored the minor's cues and declined to participate in activities in which the minor was interested.

Since the February 21 six-month review hearing, mother had tested negative for drugs 20 times, had no-showed on 19 occasions, and had tested positive for drugs (methamphetamine) on April 2. She had not submitted to a drug test since June 17, having 13 no-shows from June 20 to July 31. As to the positive drug test, mother did not acknowledge her April 2 relapse, but instead claimed that "she must have been poisoned by her previous landlord."

Mother's housing remained unstable. She had consistently advised the Department that she intended to move to the Evolving Door or a comparable recovery-based housing program. But her substance use disorder service provider told the Department that she had repeatedly advocated for mother's acceptance into Evolving Door, "only to have [mother] decline the bed once available."

Mother began seeing a counselor in February 2019. Her counselor reported that "[mother] '[d]oes not believe her child has special needs and shows little interest in learning ways to help him understand difficult information. . . . [Mother] appears to need to overly explain inconsistent facts. She blames others frequently, and conjectures conspiracy notions about others. Yet she minimizes problems for herself and her son.' "

The counselor also reported that over the past three months, mother had "displayed 'a lengthy period of emotional dysregulation, perhaps due to the use of a prescribed medication that was not useful. Since that time, her attention in sessions has improved.' "

The Department reported that mother's parenting education counselor at Leaps and Bounds had advised that "[mother] presents as 'all knowing' and . . . is 'not open to hearing feedback' around her parenting skills and the interactions she has with [the minor] during Leaps and Bounds sessions. [The counselor] also notes that [mother] often disregards the parenting education provided . . . [and] there has not been growth with regard to [mother's] parenting skillset."

It was also reported that the minor had a change in placement in April 2019 but was still living in Monterey County. It was not a concurrent home. He had finished his year in kindergarten "strong, making significant progress in all academic areas." The minor had an independent education plan (IEP), effective May 2, 2019. He was reported to be "currently functioning academically above average in many areas, though he does struggle with Common Core curriculum that involves letter recognition and letter sounds." The Department also reported that the minor had made new friends at his school and had celebrated his sixth birthday at a park with these friends and peers he had met through church.

The Department noted that the minor had special medical needs based upon the prior diagnosis of hemiplegic cerebral palsy causing a weakening of the left side of his body. The minor was also diagnosed during the reporting period with ADHD, for which he received a prescription of Ritalin to address "his focus and attention span." In addition to these medical conditions, the Department reported that the minor had had been diagnosed with a peanut allergy and was treated at the emergency room on July 12 after having an allergic reaction to food at a restaurant. On July 29 while attending day camp, the minor fell ill and was transported by ambulance to the hospital. He was treated for seizures and ultimately diagnosed by a neurologist, Dr. David Huntley, with epilepsy for

which he was prescribed medication, Trileptal.  Dr. Huntley advised that such seizure disorder in a child "is often misdiagnosed as ADHD or as a behavioral health-related disorder because a child may appear to not listen or follow instructions and is often 'in their own world.'  Dr. Huntley reports that continued use of Trileptal may result in a decrease in [the minor's] ADHD[-]like symptoms as seizures become controlled and managed."

The Department reported that based upon his cerebral palsy diagnosis, the minor was receiving both physical and occupational therapy services.  In February 2019, he had had his left foot fitted with an orthotic brace.  He also had a "right hand 'resting hand splint' that is used to encourage increased use of [the minor's] left hand."

The Department concluded that mother had "not shown that she [was] able to provide the level of consistent follow[-]through required to ensure [the minor's] safety and well-being, especially given his special needs."  The Department recommended that mother's family reunification services be terminated and that the minor's educational rights be assigned to his CASA representative, Meredith.

In a supplemental report filed October 18, 2019, the Department advised that on August 23, the minor had been placed in a licensed foster home in Santa Cruz County.  The Department stated that since its August 2 report, mother "has continued to miss calls and visits with [the minor] and has arrived late to his medical appointments.  In addition, [mother's] participation in her Case Plan Objectives and her engagement with [the caseworker] has decreased since the last Status Report."  Between August 14 and October 17, mother had 27 supervised visits scheduled; she arrived late on 12 occasions, and no-showed on four occasions.  Services provided by Leaps and Bounds were closed because of mother's "repeated no-shows."  As for counseling services through the Parents Center, mother was "on 'wait-list status' due to repeated no-shows."

The Department observed in the supplemental report that the 12-month review hearing had been postponed for a month and one-half, which fortuitously gave mother

16

"additional time to demonstrate engagement in . . . both her Case Plan Objectives and in showing to [the minor's] visits and appointments on time. [Mother's] continued pattern of late, missed and no-shows for visits and his appointments, as well as her own [appointments], has a significant negative impact on [the minor's] physical and emotional well[-]being, [and] his need for consistent safe care."

### b. Caregiver Report

The caregiver in his August 2019 report advised that the minor had begun working with a new behavioral therapist, and that he had been responding positively to the therapy. The caregiver reported that the psychotropic medication the minor had been taking for ADHD had helped with his impulse control. After being treated on July 29 in the emergency room for seizures and diagnosed with epilepsy, he began taking anti-seizure medication and was being treated by a pediatric neurologist. The caregiver advised that the minor was "thriving in his current living arrangement . . . [and] consistently refer[red] to it as 'home.' " He reported that the minor "continue[d] to show a diminishing interest in his relationship with his mother. While hospitalized, he did not ask to see her. The nightly phone calls have become increasingly short (less than two minutes). If [mother] misses a call or visit, he is not phased by it."

### c. CASA Report

CASA representative Meredith submitted a lengthy report in August 2019. She advised that since the minor's placement with his foster parents in April 2019, she had observed "dramatic changes in all aspects of his development. He is a happy boy. His foster parents have provided [the minor] with a loving home where he is safe and receives consistent and reliable support for his emotional, physical, and educational needs. Since he has been able to have all of his educational and medical needs addressed[,] he is thriving. He loves school." Meredith reported that the minor had attended several summer camps in 2019. She reiterated the Department's reports concerning mother's inconsistency in attending meetings and medical appointments

17

concerning the minor. Meredith advised that " '[s]ince the most recent [six-]month review court date in February[,] Mom has missed all three doctor visits (Stanford Development, GI and [p]rimary care physician). Additionally she has missed school meetings (missed 2 of 2), Leaps and Bounds (missed 2 of 2), orthotic fitting (missed 1 of 1), and Behavioral Health visits (missed 6 of 7). She only attended 1 of 11 medical appointments (less than 10%). She has missed 5 of 14 supervised visits. This has played an emotional toll on [the minor,] consistently resulting in increased irritability . . . on the night following a missed visit and the next day or two. Mom has missed a total 19 of 30 appointments (including supervised visits). That means she has only attended 36% of expected appointments. . . From July 2018 to April 2019[, mother] has missed 77 of 163 total visits (including supervised visits). This is an attendance rate of 52%.' " Meredith reported that the minor "continues to need many medical appointments" that require hours on the road to be expended by the foster parents.

### 2. Hearing

The juvenile court conducted a contested 12-month review hearing on October 23, 2019. The minor was six and three-quarters years old at the time. Mother testified and submitted several exhibits. The juvenile court adopted the Department's recommendations. The juvenile court, inter alia, terminated mother's reunification services, and it scheduled a 366.26 hearing for February 6, 2020.

## G. Section 366.26 Hearing (July 2020)

### 1. Department's 366.26 Hearing Reports

The Department filed a report on January 27, 2020, in connection with the 366.26 hearing. It reported that the minor had been placed in a concurrent home in Madera County on January 19, 2020. There were three older children and two dogs in the foster family. The foster mother was a stay-at-home mother who was very involved in the school and extracurricular activities of the three children. She had prior experience as a CASA in Madera County. The foster mother planned to make sure that the minor's

18

needs were met. The foster father was a peace officer. He planned to take time off from work to spend time with the minor and to engage in family activities.

The foster family contacted the Department on November 6, 2019, and had expressed that they were interested in placement and adoption. Shortly thereafter, the foster family began visiting the minor weekly before he was placed in their home. The foster parents expressed a willingness to adopt the minor, and their three children (ages 15, 12, and 10) were in agreement. The minor was also excited to be part of the foster family's life. The Department determined that the foster family could meet the minor's medical and emotional needs. It opined that "[t]he family has quickly attached to [the minor] and love having him in their home. [The minor] loves to share all the fun things he gets to do with the family. [The minor] is generally and specifically an adoptable child."

The minor was seen by a Palo Alto pediatric neurologist in December 2019, and it was determined that the minor did not have epilepsy but should receive regular medical care for his cerebral palsy.

After October 23, 2019, mother's supervised visits with the minor were reduced to one time per month. Mother had arrived late for the November 2019 and January 2020 visits; she missed the December visit. The Department expressed concern that mother had conversations with the minor during visitation that were not age-appropriate or that concerned the dependency proceedings and were not in the minor's best interests. The prior caretaker had also reported that mother had had conversations with the minor during doctor's and therapy appointments that were not age-appropriate or that concerned the dependency proceedings.

The Department recommended that the parental rights of mother be terminated, and that a permanent plan of adoption for the minor be established.

In a supplemental July 2020 report, the Department advised the court that the minor had "settled in to the [new foster] home better than expected despite having [had]

19

four placement changes." The minor had gotten along well with the foster family, and the social worker had observed during video visits that the minor appeared comfortable in the home and was "seen smiling, laughing, showing affection to the prospective adoptive mother and telling jokes and playing with the prospective adoptive father. . . . [The minor] gets along well with [the three children in the foster family] and calls them his siblings." On July 13, in response to the social worker asking "who his forever family was . . . he proceeded to point at his prospective adoptive parents who were sitting next to him and said 'my parents.' " He responded " '[Y]es,' " when the social worker asked if he wanted them "to care for him forever until he is a grown man."

The Department advised that the new foster parents had made sure that the minor's medical needs were met. They were "very organized" in addressing the minor's medical appointments. They reported that on July 5, the minor had "suffered a focal seizure." He was observed having rapid eye movements but was coherent and able to speak without any problems. He was taken to the emergency room and was admitted to the local hospital for testing. He was discharged with two antiseizure prescriptions, and as of July 14, he was doing well.

In its supplemental report, the Department also stated that since the minor's placement change on January 19, mother had had one in-person visit with the minor on February 17; thereafter, all visits occurred virtually because of the COVID-19 pandemic. The February 17 visit went well, and mother's conversation during the visit "was appropriate." The foster mother reported that the minor had exhibited no behavioral changes after the visit. The foster mother reported that the subsequent monthly video visits had gone well and there were no concerns arising out of them.

### 2. *CASA Reports*

CASA representative Meredith advised the court in a January 2020 report that the minor was "active and outgoing" and was currently "thriving." She stated that she had observed "dramatic changes in all aspects of his development" since his placement with

the several foster families.  Meredith reported that the minor was a first-grader who was being "mainstreamed," and that he received 210 minutes per week of specialized instruction.  She advised that the minor was moving on January 19, 2020, to Madera County to live with his new foster family.  He first met the new family on December 14 at a several-hour visit.  Since that time, he had had weekly sleepovers on weekends (for a total of 10 nights), and the visits had gone very well.  "He always asks when he can see them again and sometimes asks if he can stay another night."  When the social worker asked the minor "what he would like with regard to a family he could live with until he is a man he said, 'A mom and dad and brothers and sisters, and two dogs.' "  The social worker later told the minor that the new foster family "would like to have him 'live with them until his is a man,'  [The minor] said he was excited to live with the family and asked if he could go today. . . .  He told his [then] foster mom that night that he was so happy he was going to get to live with the new family."

In a supplemental July 2020 report, Meredith advised that the minor had "adjusted extremely well to his current placement."  The minor had a new physician in Modesto, was attending Ninja class in a gymnastics facility that was helping him improve his strength and agility, and he had been in good health with no medical emergencies.  He was no longer taking any medications except for Flonase for allergies.  The foster mother reported to Meredith that the minor was "no longer emotional after his weekly phone calls with his mom . . . [and, as of] June 10, 2020[,] he now 'just goes back to what he was doing before the call.' "  The minor had an appointment with a physiatrist in June, who gave him a referral for occupational and physical therapy.  Additionally, the minor was receiving behavioral therapy.  The minor received an accelerated reader award in June, and he was receiving weekly private swimming lessons "which he loves."

21

### 3. *Hearing Pursuant to Section 366.26*

The juvenile court conducted a contested 366.26 hearing on July 20, 2020.[7] The minor was seven and one-half years old at the time. Mother at the outset requested a continuance based upon (1) the existence of the COVID-19 pandemic, and (2) mother's having not received the July 14 supplemental report of the Department. The court denied the continuance request.[8] During the hearing, mother challenged the out-of-county placement of the minor, contending that the Department had not made reasonable efforts to place the minor in Santa Cruz County, and that there were relatives available with whom the minor could be placed. Counsel for mother also asserted the applicability of the beneficial parental relationship exception to adoption.[9]

The court received into evidence the Department's section 366.26 report dated January 27, 2020, the Department's subsequent reports, and the report of the CASA representative. Mother provided testimony and submitted several exhibits, including visitation logs.

Mother testified that after her son's removal and during the reunification period, she visited him twice a week. During the visits, she would bring snacks and she would help him with homework. Mother stated that, despite her requests for visits in the park or at restaurants, she had never been given the opportunity for anything beyond one-hour supervised visits. She also testified that the visitation supervisor never gave mother the

---

[7] Father did not appear at the 366.26 hearing. His counsel also did not appear; rather, mother's counsel made a special appearance on behalf of father's counsel. Mother's counsel advised the court that father's counsel asked to be excused from the hearing because he had not been in contact with father.

[8] Mother does not challenge the court's denial of her request for a continuance of the 366.26 hearing.

[9] Mother's counsel made a one-sentence argument below that the beneficial sibling relationship between the minor and his adult half-sister applied as an exception to adoption. Mother does not raise this argument on appeal.

opportunity to parent her child during the visits; she would get "cut . . . off" and "spoken over" by the supervisor when she tried to interact with her son. Mother also denied the Department's claim in its reports that mother had had conversations with the minor during visitation that were not age appropriate. At the end of their visits, mother would hug the minor and tell him she loved him, and he would tell her he loved her.

Since the termination of her services, mother testified, she had spoken with the minor by telephone. She was "only allowed to talk to him once a week, which is not enough." Mother testified that she had not missed any telephone calls. She also had monthly visitation through video phone calls. Mother testified that she had followed up about the minor's circumstances by asking about his medical appointments and the status of his schooling.

Mother stated that she opposed the termination of her parental rights because her bond with her son "is very, very close despite all this time and despite all of this distance." She testified that "[m]y son and I have always maintained a bond. We have always been very close. We still are. I am still his mom. He still wants to come home when asked."

The court adopted the findings proposed by the Department. The court found that the minor's continued out-of-home placement was necessary; mother's reunification services had previously been terminated; the minor was generally and specifically adoptable; and the minor was placed in a prospective adoptive home. The juvenile court did not sustain the claims by mother of the beneficial parental relationship and beneficial sibling relationship exceptions to adoption. It concluded that, although mother had "certainly made an effort to maintain a visiting relationship with her son," "this is merely a visiting relationship . . . [akin to] the relationship with an aunt or friend." The court

ordered that adoption was the permanent plan for the minor, and it terminated mother's and father's parental rights.[10]

Mother filed a timely notice of appeal from the order after the 366.26 hearing.

## II.    DISCUSSION

### A.    Hearings Under Section 366.26

#### 1.    *Generally*

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the selection and implementation hearing as provided under section 366.26.  The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children."  (*Id.*, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)  There are seven statutory choices for the permanency plan; the preferred choice is adoption, coupled with an order terminating parental rights.  (§ 366.26, subd. (b); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["Legislature has thus determined that, where possible, adoption is the first choice"]; *ibid.* [where child is adoptable, "adoption is the norm"].)  The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted."  (§ 366.26, subd. (c)(1).)

Thus, at the 366.26 hearing, "in order to terminate parental rights, the court need only make two findings:  (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification

---

[10] Mother presented evidence and argument below in support of the claims that the out-of-county placement was improper, and that the Department did not adequately address the minor's potential placement with three different relatives.  The Department submitted brief rebuttal testimony of social worker Lucero Parra concerning the potential relative placement of the minor.  The juvenile court denied mother's objections (1) to the placement of the minor, and (2) that potential relative placement was not properly considered by the Department.  Mother does not challenge on appeal the court's rejection of mother's claims concerning the minor's placement.

services shall be terminated. . . . '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.]" (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.)

"If the court determines it is likely the child will be adopted, certain prior findings by the juvenile court (e.g., that returning the child to the physical custody of the parent would create a substantial risk of detriment to the physical or emotional well-being of the child) shall constitute a sufficient basis for the termination of parental rights unless the juvenile court finds one of six specified circumstances in which termination would be detrimental [to the child]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1522-1523, citing § 366.26, subd. (c)(1).)[11] An exception to adoption provided by statute will not be found by the juvenile court unless it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the [six statutory] circumstances." (§ 366.26, subd. (c)(1)(B).)

### 2. *Parental Exception to Adoption at 366.26 Hearing*

The six specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53, original italics.) They " 'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the

---

[11] *In re I.W.*, *supra*, 180 Cal.App.4th 1517 was recently disapproved on another ground. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*, original italics.)

The beneficial parental relationship exception to adoption (hereafter, the parental relationship exception) was asserted by mother below and is the central issue on appeal. Under this exception as provided in section 366.26, subdivision (c)(1)(B)(i), the juvenile court will not terminate parental rights if it " 'finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' The exception does not require proof the child has a 'primary attachment' to a parent or the parent has 'maintained day-to-day contact' with the child. [Citation.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123-124.) But "[i]nteraction between natural parent and child will always confer some incidental benefit to the child. . . . The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

There are three " 'component determinations' " made by the juvenile court, the first two of which establish the existence of a beneficial parental relationship, and the third being the court's assessment of whether that relationship (assuming its existence) presents a compelling reason not to terminate parental rights. Those three " 'component determinations [are]—[(1)] whether the parent has maintained regular visitation, [(2)] whether a beneficial parental relationship exists, and [(3)] whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." ' [Citations.]" (*In re Caden C.* (2019) 34 Cal App.5th 87, 104 (*Caden C.*), review granted Jul. 24, 2019, S255839; see also *In re Bailey J.* (2010)

189 Cal.App.4th 1308, 1316 (*Bailey J.*) [mother demonstrated regular visitation but not a beneficial parental relationship].)[12]

Assessment of the first component is "quantitative and relatively straightforward, asking whether visitation occurred regularly and often." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612.) It is an evaluation of "whether the parent consistently has contact with the child." (*Id.* at p. 613.) " 'Sporadic visitation is insufficient.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

Determination of the second component of "whether the nature and extent of a particular parent-child relationship is sufficient to be deemed 'beneficial' . . . is a more involved inquiry, made on a case-by-case basis by taking into account many variables which affect the parent/child bond." (*Caden C.*, *supra*, 34 Cal App.5th at p. 104, rev. granted.) "The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) In this case-specific endeavor, the court looks at such factors as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.) "A showing the child derives *some benefit* from the relationship is not a sufficient ground to depart from the statutory preference for adoption. [Citation.]" (*In re Breanna S.* (2017) 8 Cal.App.5th

---

[12] Case law discussing the parental relationship exception generally describes the juvenile court's inquiry as having "two prongs, i.e., regular visitation and benefit to the minors of continued contact with the parents that outweigh[] the benefits of adoption." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212; see also *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396-397.) It is apparent that the parental relationship's existence—the second "component" described in *Caden C.*, *supra*, 34 Cal App.5th at page 104, rev. granted—is an assumed fact in the second "prong" of whether the benefit to the child of continued contact with the parent outweighs the benefits of adoption. For purposes of our analysis here, we will consider the three components of the exception as described in *Caden C.*

636, 646, italics added.) "To meet the burden of proving the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. [Citation.]" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527.) Thus, "[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

In assessing the third component, assuming the parent establishes the existence of a beneficial parent-child relationship, the juvenile court must then determine whether the relationship "constitutes a 'compelling' reason to forgo termination of parental rights." (*Caden C.*, *supra*, 34 Cal App.5th at p. 105, rev. granted.) This high standard underscores that " '[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.]" (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643, original italics.) In determining whether the exception applies, the juvenile court performs a balancing task of determining whether "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added; see also *In re Anthony B.*, *supra*, 239 Cal.App.4th at. p. 396 ["question is whether

28

that [parental] relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption"].)

The burden is on the parent asserting the parental relationship exception to produce evidence establishing that exception. (*In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 646.) "The court's decision a parent has not satisfied this burden may be based on any or all of the [three] component determinations—whether the parent has maintained regular visitation, whether a beneficial parental relationship exists, and whether the existence of that relationship constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citations.]" (*Id.* at pp. 646-647.) The parent must prove the exception by a preponderance of the evidence. (*Caden C.*, *supra*, 34 Cal App.5th at p. 104, rev. granted.)

**B.     Standard of Review**

A determination of the appropriate standard of review requires that we first ascertain what is, and what is not, being asserted on appeal. In the ordinary appeal from an order after a 366.26 hearing, a finding by the juvenile court based upon clear and convincing evidence that the child is likely to be adopted is reviewed for substantial evidence. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) Review of a court's determination of the applicability of the parental relationship exception under section 366.26 is governed by a hybrid standard under which the court's determination (1) regarding the existence of a beneficial parental relationship is reviewed for substantial evidence; and (2) as to whether the existence of the parental relationship constitutes a compelling reason to conclude that termination of parental rights would be detrimental to the child is reviewed for abuse of discretion. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

Here, mother does not challenge on appeal the court's finding at the 366.26 hearing that the minor was adoptable. Mother's sole challenge is that the juvenile court erred in finding inapplicable the parental relationship exception to adoption.

Accordingly, our standard of review here is governed by the hybrid standard (substantial evidence/abuse of discretion) enunciated by a panel of this court in *Bailey J.*, *supra*, 189 Cal.App.4th at pages 1314-1315. As to the second part of that standard of review, "[a]n abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642, quoting and citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

## C. No Error in Finding the Parental Relationship Exception Inapplicable

Mother contends that the court abused its discretion. She contends that because the court found that mother had " 'certainly made an effort to maintain a visiting relationship with her son,' " and there was clear evidence of a strong parent-child bond, "the only issue in this appeal is whether, given the existence of that bond, the termination of parental rights was an abuse of discretion." Mother emphasizes (1) the fact that she raised the minor for the first four years of his life as his sole custodian, and (2) after the child's removal, she continued to maintain a bond with him as demonstrated through regular visitation.

In our review of the juvenile court's decision, we consider the three " 'component determinations' " of the beneficial parental relationship, namely, " '[(1)] whether the parent has maintained regular visitation, [(2)] whether a beneficial parental relationship exists, and [(3)] whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." ' [Citations.]" (*Caden C.*, *supra*, 34 Cal App.5th at p. 104, rev. granted.)

### 1. Regular Visitation

We address the first component, i.e., regular visitation. The trial court observed that mother had "certainly maintained an effort to maintain a visiting relationship with her son." The court indicated that it had considered the visitation logs showing that mother had "done a fairly good job" of maintaining visitation, although there had been

30

some issues with tardiness and the staff having been required on occasion to redirect mother. There was substantial evidence supporting the juvenile court's implied finding that mother had maintained regular visitation. (See *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

### 2. *Existence of Beneficial Relationship*

The record is somewhat unclear as to the juvenile court's finding regarding the second component, i.e., " 'whether a beneficial parental relationship exists.' " (*Caden C.*, *supra*, 34 Cal App.5th at p. 104, rev. granted.) The record does not show that the court made a specific finding that such a beneficial parental relationship existed between mother and the minor. Rather, the court's comments suggest it concluded that no such beneficial relationship was established. In announcing its decision, the court observed that "this is merely a visiting relationship. [Minor's counsel] likened it to the relationship with an aunt or friend." In determining whether the parent has established the existence of the beneficial parent-child relationship, the juvenile court considers factors such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, the minor was seven and one-half years old at the time of the 366.26 hearing in July 2020. Mother had custody and care over the minor from his birth to his initial removal in October 2017 (approximately four years eight months). The minor returned to mother's care from November 2017 to June 2018. The minor was then in foster care for the next two years and two months up to the date of the 366.26 hearing.

The record of supervised visitation and other telephone contacts between mother and the minor during the approximate two years that the minor was in foster care assist in evaluating the positive and negative effects of the interactions between mother and the minor. The Department reported that the quality of mother's supervised visits after the minor's second detention in August 2018 (when the court approved the Department's

31

section 387 petition) until December 2018 was adequate. Mother's commitment to attending the visits during that period, however, was less than adequate. Of the 37 potential supervised visits, it was reported that mother arrived on time 15 times, arrived late 10 times, and no-showed on 12 occasions (approximately one-third of the scheduled visits). On one visit in November 2018, staff expressed concern that mother was under the influence.

For a subsequent reporting period, the Department advised (in an August 2019 report) that the quality of mother's supervised visitation was adequate. It was reported by staff, however, that there were issues with mother ignoring the minor's cues, declining to participate in activities in which the minor expressed interest, and ignoring the recommendations of staff that mother work on a toileting routine with the minor. It was also reported that the minor had frequent toilet accidents during and after the visits, although he did not have such accidents at other times. Between August and October 2019, of the 27 supervised visits scheduled; mother arrived late on 12 occasions, and no-showed on four occasions.

After mother's supervised visits were reduced to one time per month in October 2019, of the next three visits, mother arrived late for the November 2019 and January 2020 visits and missed the December 2019 visit entirely. There was reported concern that mother had conversations with the minor during visitation that were not age-appropriate or that concerned the dependency proceedings. Mother denied such conversations in her testimony at the 366.26 hearing. Mother attended later supervised visits in 2020 for which no concerns were expressed; they took place in February (in-person, approximately one hour), April (video call), May (video call, approximately 10 minutes), and June (video call).

In addition to supervised visitation, there were ongoing telephone visits between mother and the minor that were facilitated by the foster parents. As was the case with supervised visitation—where there was evidence of many missed visits and visits in

which mother arrived late—the record demonstrated a lack of full commitment by mother to such telephone contacts. Between June and August 2018, after the foster parents established a schedule, such telephone visits often did not occur either because mother failed to call or called at times outside of the schedule. The resource parents advised that the phone calls were fairly brief, and the minor generally was distracted and not interested in pursuing the conversations. Between February and May 2019, Mother had 67 opportunities for telephone contact with the minor and had called approximately one half of the available occasions (34 times). In a report in August 2019, the Department advised that during the reporting period, mother had missed 19 opportunities to speak on the telephone with the minor (either due to failure to call until too late in the evening or failing to call at all). The caregiver reported during this period that the telephone calls had "become increasingly short (less than two minutes). If [mother] misses a call or visit, he is not phased by it."

The record showed a lack of full commitment by mother in addressing "the child's particular needs." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) In the context of this case—where the minor had significant medical issues including left hemiparesis and cerebral palsy, possible ADHD, possible epilepsy, a serious peanut allergy, and special educational needs—his particular needs, and mother's potential ability to address them, were very significant factors in consideration of the second component (as well as the third component) of the beneficial relationship exception to adoption. We note that probably the most significant factor that resulted in the minor's second removal in June 2018, as alleged in the Department's section 387 petition, was mother's inability to address the minor's special medical, educational, and physical needs, including the ongoing need for physical and occupational therapy.[13] Indeed, between January and

_____

[13] Mother's inability to address the minor's particular needs was also stressed in the allegations of the amended petition filed by the Department in November 2017, one month after the initiation of these proceedings.

33

June 2018, mother had missed 10 of 14 medical appointments, six of seven physical therapy appointments, nine of 16 occupational therapy appointments, and six of eight counseling sessions; had failed to enroll the minor in school; had not taken him to a necessary dental appointment; and had not followed up in obtaining the minor's prescribed foot braces.

Between February and May 2019, mother missed 12 (two-thirds) of the minor's 18 medical appointments, and she arrived late to five of them. Notably, two of the missed appointments were a March two-hour appointment with a pediatric psychologist evaluating the minor for ADHD, and a March appointment with the minor's pediatrician resulting from the psychologist's findings and recommendation that the minor begin taking medication to address ADHD. Mother's pattern of inconsistent commitment continued in the next period of May to August 2019: she was late for some of the minor's medical and therapy appointments and missed 14 appointments. Two of the notable missed appointments were ones with the minor's new pediatrician (a change in pediatricians having been initiated by mother), and with a gastroenterologist. She also arrived late to four medical, behavioral health, and occupational therapy appointments. These missed appointments—coupled with missed visits and calls—negatively impacted the minor, who "express[ed] feelings of sadness, anger and frustration." Moreover, mother's counselor whom she began seeing in February 2019 reported that mother " '[d]oes not believe her child has special needs and shows little interest in learning ways to help him understand difficult information. . . . [Mother] minimizes problems for herself and her son.' "

Mother challenges the juvenile court's conclusion that she and the minor "had merely a visiting relationship, not a parental one." She relies on factors such as her having raised the minor for more than the first four years of his life; and her contention that a strong parent-child bond was demonstrated by the supervised visits during which they conversed, played, and were affectionate with each other. There was evidence in the

record that, notwithstanding that the minor was raised by mother for the first four-plus years of his life, the connection between them had lessened significantly over time and as the minor had adjusted to his new life with the foster families with whom he lived. There was evidence that the quality of the supervised visits was adequate, and mother in her testimony at the hearing emphasized the regularity and the positive nature of the visits. (See *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1315-1316 [" 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship"].) But there were, as identified above, several issues with mother's visits that were noted over time by the Department. And there was significant evidence—through mother's numerous late arrivals and no-shows to supervised visits, the minor's medical and therapy appointments, and numerous missed telephone calls with the minor—that negated mother's claim to a close parent-child relationship.[14] Moreover, as discussed above, consideration of the particular needs of the minor raises a strong challenge to mother's claim that a beneficial parent-child relationship existed.

In short, viewing the record as a whole and assuming the juvenile court found that a beneficial parental relationship between mother and the minor did not exist, there was substantial evidence to support that conclusion. (See *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314 [juvenile court's determination regarding existence of beneficial parental relationship reviewed for substantial evidence].)

---

[14] In support of her claim that she established a parent-child bond, mother also relies upon a social worker's observations in December 2017 that the minor became distressed when he was not with his mother, " 'mother and the child have a very strong bond,' " " 'interact well with each other[,] and the child is happy to be in her company.' " It must be noted that these observations took place before the second time the minor was removed from the home and were two and one-half years before the 366.27 hearing. These December 2017 observations do not *establish* the existence in July 2020 of a beneficial parental relationship.

### 3.    *Detriment of Severance of Parental Relationship*

As we have discussed, *ante*, there was substantial evidence to support a finding that a beneficial parental relationship here did not exist, and therefore the juvenile court did not err in rejecting mother's claim that the adoption exception applied.  Because, however, the court did not explicitly find that there was no beneficial relationship—and because mother argues that the juvenile court abused its discretion, thereby applying a standard of review applicable to the third component of the exception (see *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315)—we will address whether the juvenile court erred by rejecting mother's contention that " 'the existence of that [parent-child] relationship constitute[d] "a compelling reason for determining that termination would be detrimental to the child." ' [Citations.]" (*Caden C.*, *supra*, 34 Cal App.5th at p. 104, rev. granted.)  In doing so, we are mindful that this inquiry required the "juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]" (*Bailey J.*, 189 Cal.App.4th at p. 1315, original italics.)

In assessing the impact of severance of the parental relationship, the juvenile court may properly consider all aspects, both positive and negative, concerning mother's relationship with the minor here.  This would include mother's entire history, and her conduct throughout the dependency proceeding, including her performance under her case plan.

The record showed that mother had a 20-plus year history of substance abuse, including her completion of multiple treatment programs.  She also had a history of convictions for drug-related offenses.  Mother had a prior child welfare history involving the minor, and, earlier, the minor's half-sister, A.A.  In the proceedings involving A.A., mother had failed to reunify, and her parental rights were terminated in September 2012.  The prior 2013 proceeding involving the minor had arisen due to caretaker abandonment after mother had been arrested for driving under the influence and driving recklessly with

36

the minor in the vehicle. Additionally, mother had some history of mental health issues, including a past diagnosis of anxiety/depression treated through medication that she was not taking regularly.

The juvenile court in performing its balancing function under the third component may also consider mother's conduct throughout the dependency proceedings, including her progress in her case plan. Mother's commitment to sobriety was, due to her inconsistency in testing, uncertain. Throughout the dependency proceedings, she had a pattern of no-shows for drug testing and periods in which she did not test at all. The Department observed that, prior to the June 2018 filing of the supplemental petition, mother did not follow through with drug assessment and was inconsistent with drug testing. After the minor's second removal in June 2018, mother was a no-show for 16 scheduled drug tests between July and November 2018. And after the February 2019 six-month review hearing, the Department noted that, although mother had tested negative for drugs 20 times, she had no-showed on 19 occasions, and she had tested positive for drugs (methamphetamine) on April 2. Between June 20 to July 31, 2019, she did not test, and she had 13 no-shows. And as to the positive drug test in April 2019, mother did not acknowledge this relapse; instead, she claimed that "she must have been poisoned by her previous landlord."

In addition, the record reflected that mother had a history during the proceedings of unstable housing. She and the minor were homeless at time of referral in October 2017. After securing temporary housing, mother received an eviction notice from Rebele Family Shelter in June 2018. And as of Aug 2019, mother's housing remained unstable.

Moreover, in considering mother's conduct during the dependency proceedings, the court may consider her consistent inability to meet the special needs of the minor. As discussed in detail above, between January and June 2018—while the minor was under mother's care with a family maintenance program—mother had missed (a) 10 of

37

14 medical appointments, (b) six out of seven physical therapy appointments, (c) nine of 16 occupational therapy appointments, and (d) six of eight counseling sessions for the minor. During that same period, there were instances of mother having left the minor stranded at school, her being routinely late when CASA representative Meredith dropped the minor off at the family shelter after visits, and an instance of leaving the minor by himself at the shelter in the middle of the night. Also during that time period, there were concerns at school because the minor often arrived late and had missed breakfast. After the minor's second removal in June 2018, mother continued the pattern of missing or being late to the minor's medical appointments, therapy appointments, and meetings.

And in considering mother's progress under her case plan, the court could consider mother's performance with respect to parenting education. The Leaps and Bounds parenting education counselor indicated that mother showed a lack of receptivity to suggestions regarding parenting. Further, Leaps and Bounds services were ultimately closed because of mother's "repeated no-shows."

Considering the potential impact of the severance of the parental relationship, the juvenile court would have necessarily considered the potential benefits that adoption would afford the minor. The minor had done well in prior foster family placements. The prospective adoptive family was stable. The foster mother was very involved in the school and extracurricular activities of her three children, and she was a former CASA representative. She and her husband demonstrated a strong commitment to integrating the minor into their family. The minor likewise showed great enthusiasm in becoming part of their family. The Department reported that "[t]he family has quickly attached to [the minor] and love having him in their home." And the prospective adoptive family had demonstrated that they were able to ensure that the minor's medical needs were satisfied. In short, the record showed that, although it had only been seven months as of the 366.26 hearing, the prospective adoptive parents had provided a stable and loving

38

home environment in which the minor felt very comfortable and in which he expressed a desire to remain until adulthood.

It is very apparent to this court that mother loves her son very much. But in making its " 'quintessentially' discretionary decision . . . [by] determin[ing] the *importance* of the [parental] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption" (*Bailey J.*, 189 Cal.App.4th at p. 1315), the juvenile court here did not abuse its discretion. It properly concluded that, in considering the stability that adoption would afford the minor, the potential detriment to the minor from severance did not "constitute[] a 'compelling' reason to forgo termination of parental rights." (*Caden C.*, *supra*, 34 Cal App.5th at p. 105, rev. granted.)

## III. DISPOSITION

The order pursuant to section 366.26 of July 20, 2020, in which the juvenile court ordered adoption as the permanent plan for the minor and terminated parental rights, is affirmed.

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:


_____
ELIA, ACTING P.J.


_____
DANNER, J.


*In re M.O.; SCHSD v. B.L.*
**H048304**